BCG

ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.
Date of Incident: March 13, 2011

## ECONOMIC EXPERT CERTIFICATION

I certify to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The analyses, opinions, and conclusions contained in this report are limited only by the reported assumptions and limiting conditions therein, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. I have no bias with respect to the individual that is the subject of this report or to the parties involved with this assignment.

4. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

5. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of either party in this litigation, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of my report.

6. All reasonable efforts were made to obtain those documents and records necessary to establish an accurate value of economic damages consistent with the standards of my profession, my professional judgment and experience, and documents that would be required by my professional peers were they to perform this valuation.

7. My analysis has not purposely omitted from consideration documents or records that, if considered, would adversely affect either party in this matter and the determination of accurate economic damages.

8. The economic analyses, opinions, and conclusions were developed, and this report is in conformity with the professional standards established by the American Institute of Certified Public Accountants (AICPA), the Association of Certified Fraud Examiners (ACFE), and the National Association of Certified Valuation Analysts (NACVA) relating to litigation services and is further consistent with industry practices and conventions used to establish economic damages in matters such as this specific assignment.

BARACH CONSULTING GROUP, LLC

_____
Gary S. Barach, CPA, CFE, CFF, CVA

3-5-2013
Date

i

BCG

ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.
Date of Incident: March 13, 2011

## VALUE CONCLUSION:

In the opinion of the undersigned, based on the documents provided and the procedures performed, subject to the assumptions and limiting conditions incorporated herein, the economic damages accruing to the Estate of Carmelo Winans as the result of the March 13, 2011 incident, expressed within a reasonable degree of economic and accounting certainty as of this reporting date of March 5, 2013 amounts to:

**ELEVEN THOUSAND EIGHT HUNDRED SIXTY-TWO DOLLARS**
**($11,862)**
**(Premise I)**

OR

**NINETEEN THOUSAND EIGHT HUNDRED THIRTY DOLLARS**
**($19,830)**
**(Premise II)**

BCG

**ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.**
**Date of Incident: March 13, 2011**

BACKGROUND

The subject litigation is the result of a shooting that occurred on March 13, 2011 that resulted in the death of Carmelo Winans.

Carmelo Harold Winans was born on January 2, 1982. He was 29.18 years of age at the time of the incident with a life expectancy of 44.00 additional years to age 73.18.[1] Mr. Winans was not married. It is reported that at the time of the incident, Mr. Winans resided with his father at 1734 North Third Street, Philadelphia, Pennsylvania. He moved in with his father in January 2011.

Mr. Winans is survived by two minor children. His son, Harold Jhamir Winans, was born on December 20, 1999, and is currently 13.21 years of age. His daughter, Jhanae Beckham, was born on July 24, 2002, and is 10.61 years of age. Both children reside with their mother, Levonne Patrice Beckham, Mr. Winans' former girlfriend.

Mr. Winans' mother, Bernadette Winans, is 51 years of age. She completed 9 years of education and did not obtain a GED. Mr. Winans' father, Carmelo Santiago, is 51 years of age. He is a high school graduate and served in the Army National Guard. Ms. Winans testified that her son attended various schools until 9th or 10th grade. She does not know if a GED was subsequently obtained.

Mr. Santiago testified that at the time of the incident, his son was working at Dunkin Donuts. He stated that the employment started shortly after January 7, 2011, and his son was earning $5 per hour. We have been provided no records disclosing the initial date of hiring, the hourly rate paid, or his position.

---

[1] "United States Life Tables, 2007", National Vital Statistics Reports, Vol. 61, Number 3, September 24, 2012.

- 1 -

BCG

ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.
Date of Incident: March 13, 2011

## ASSESSMENT OF ECONOMIC DAMAGES

**Premise of Calculation of Damages**

Economic damages have been calculated based on inflationary future growth discounted to Present Value. For presentation purposes, we have segregated economic damages into past and future damages. Past damages are defined as those accruing from the date of the incident through the date of this report, March 5, 2013. Future damages are defined as those accruing after the date of this report.

**Duration of Economic Damages**

In determining economic damages, we have established the following periods for the various components of economic damages:

- Earnings Losses. We have considered the period of damages relative to lost earnings to extend from the date of the incident through the decedent's statistical worklife (see discussion under "Worklife").

- Medical Fringe Benefits. We have considered the period of damages relative to medical fringe benefits to extend from the date of the incident through the date that costs incurred by the decedent's dependents (if any) to continue or replace medical benefits provided by the decedent's employer exceeds the cost which would have been incurred by the decedent but for the incident (see discussion under "Fringe Benefits").

Case 2:11-cv-05138-JS   Document 29-3   Filed 12/23/13   Page 5 of 15

BCG

ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.
Date of Incident: March 13, 2011

- <u>Retirement Benefits.</u>  We have considered the period of damages relative to retirement fringe benefits to extend from the date of the incident through the decedent's life expectancy (see discussion under "Fringe Benefits").

- <u>Household Services.</u>  We have considered the period of damages for household services to extend from the date of the incident through the lesser of the date that surviving family members cease to incur a cost or expend time to replace services provided by Mr. Winans on their behalf; or the date that a surviving spouse reaches age 70; or the date that surviving children reach majority age (see discussion under "Household Services").

- <u>Personal Maintenance.</u>  We have considered the period of damages relative to personal maintenance to extend from the date of the incident through the decedent's statistical worklife (see discussion under "Personal Maintenance").

**Forecast Earnings**

To forecast earnings, we have evaluated Mr. Winans' expected earnings during his worklife.

<u>Worklife</u>

To establish worklife, analyses may be performed to establish an individual's actual absenteeism history and characteristics relating to absenteeism unique to a chosen vocation. In addition, adjustments for "normal" absenteeism from the workforce are commonly developed by applying worklife statistics. To establish Mr. Winans' worklife, we referenced the sources described below.

BCG

ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.
Date of Incident: March 13, 2011

The study "Worklife Estimates: Effects of Race and Education" provides statistical tables of a condensed historical picture of worklife experiences of individuals beginning at age 16 through age 75.[2] The tables outline the number of years individuals can be expected to work based upon their age, gender, and education. The Bureau of Labor Statistics (BLS) developed these worklife statistics by incorporating mortality and labor force participation rate factors into an age-specific worklife expectancy model. Mortality rates were derived from the National Center for Health Statistics "United States Life Tables". The BLS's labor force participation rates were established based upon statistical information regarding workers' decisions to participate or not participate in the labor force. Those workers identified as labor force participants were categorized as "employed" or "unemployed seeking work". Those classified as not participating in the labor force were workers who were medically unable, discouraged, or voluntarily chose not to enter or return to the labor force.

In 2000, the Journal of Legal Economics published a revised study that adjusted the BLS estimates by using labor force activity based on data taken from the Current Population Surveys (CPS) conducted in 1997 and 1998.[3] This study was then adjusted in 2001 to reflect more specific statistics of worklife responsive to gender and levels of education.[4]

In August 2011, the Journal of Forensic Economics published worklife statistics based on application of the "Markov model" to data compiled from 2005 to 2009.[5]

---

[2] "Worklife Estimates: Effects of Race and Education", February 1986, published by the U.S. Department of Labor, Bureau of Labor Statistics (BLS).
[3] "A Markov Process Model of Work-Life Expectancies by Educational Attainment Based on Labor Force Activity in 1997-8", Journal of Legal Economics, Vol. 10, Number 3, Winter 2000-01.
[4] "The Markov (Increment-Decrement) Model of Labor Force Activity: New Results Beyond Work-Life Expectancies", Journal of Legal Economics, Vol. 11, Number 1, Summer/Spring 2001; "The Markov Process Model of Work-Life Expectancies Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals", Journal of Legal Economics, Vol. 11, Number 1, Summer/Spring 2001.
[5] "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors", Journal of Forensic Economics, Vol. 22, Issue 2, August 2011.

BCG

ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.
Date of Incident: March 13, 2011

Based on the most recent worklife statistics, Mr. Winans' remaining, condensed worklife as of the date of the incident was 24.55 years. To determine a factor for "normal absenteeism" to age 67, Social Security's defined normal retirement age (NRA) for individuals born in 1982, we applied the following formula:

$$\frac{\text{Years to Age 67 minus Worklife Years}}{\text{Years to Age 67}}$$

The resulting factor for normal absenteeism is 35.09 percent. This allowance for normal absence may be optimistic when considering Mr. Winans' atypical absences from the labor force since leaving high school in 10th grade. Evidence of such interruptions is provided by Mr. Winans' mother's testimony recounting of arrests and substance abuse that included the following:

- Arrested at age 16 or 17 for possession of firearms.
- Arrested for possession of illegal substance (could not recall date).
- Arrested for breaking and entering into his girlfriend's uncles house.
- Arrested in 2004 for attempting to break into a car.
- Arrested for assaulting his girlfriend.
- Episodes of substance abuse and participation in rehabilitation programs.

Earnings during Worklife

It is customary and proper for experts to establish earnings by evaluating historical wage documents such as tax returns and Wage and Tax Statements (Form W-2). Further research consists of interviewing past employers, analyzing rates of pay and hours worked, and correlating such specifics with industry statistics to develop a valid forecast model. In the subject case, exclusive of a Wage and Tax Statements (Form W-2) for 2011, no records have



ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.
Date of Incident: March 13, 2011

been provided disclosing Mr. Winans' past earnings. In the absence of these records we have determined earnings based on the following two premises:

*Premise I*

I

Premise I bases earnings on the sole record we were provided evidencing actual wages earned by Mr. Winans'; a Wage and Tax Statement for 2011. The statement reports earnings of $1,335.36. Assuming the wages were paid for work performed from January 10, 2011 through March 13, 2011, annualized wages for 2011 but for the incident total $9,045. The 2011 value was adjusted to future years, based on annual wage growth rates consistent with growth in wages in the private, non-agricultural sector of the economy for the past twenty years of 3.05 percent.[6] Under Premise I, past wages amount to $11,838 as illustrated by the following chart:

| Year | Annual Wages | % Year | Period Earnings | Normal Absence (35.09%) | Earnings after Absence | PV Factor | PV of Earnings |
|------|-------------|--------|-----------------|-------------------------|------------------------|-----------|----------------|
| 2011 | $ 9,045 | 0.800 | $ 7,236 | (2,539) | $ 4,697 | 1.0000 | $ 4,697 |
| 2012 | $ 9,321 | 1.000 | 9,321 | (3,271) | 6,050 | 1.0000 | 6,050 |
| 2013 | $ 9,605 | 0.175 | 1,681 | (590) | 1,091 | 1.0000 | 1,091 |
|      |         | 1.975 | $ 18,238 | $ (6,400) | $ 11,838 |  | $ 11,838 |

To determine future earnings, we applied the aforementioned growth rate of 3.05 percent to 2013 earnings of $9,605. We adjusted growth-impacted earnings to Present Value based on 30-year, Triple-A Rated, Tax Exempt, Municipal Bonds, currently yielding 3.00

---

[6] "Table B-47. Hours and earnings in private nonagricultural industries, 1965-2011", Economic Report of the President, February 2012.



ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.
Date of Incident: March 13, 2011

percent.[7] The Present Value of future earnings to normal retirement at 67 and after consideration of normal absenteeism totals $225,399.

*Premise II*

Premise II errs to the side of conservatism and provides an alternative to Premise I by accepting that a change would have occurred in Mr. Winans' life style resulting in full-time, stable employment earning minimum wage. This methodology results in annual wages of $15,121 ($7.25 x 40 hours x 52.14 weeks). Under Premise II, past wages but for the incident amount to $19,790 as illustrated by the following chart:

| Year | Annual Wages | % Year | Period Earnings | Normal Absence (35.09%) | Period Earnings after Absence | PV Factor | PV of Earnings |
|---|---|---|---|---|---|---|---|
| 2011 | $ 15,121 | 0.800 | $ 12,097 | (4,245) | $ 7,852 | 1.0000 | $ 7,852 |
| 2012 | $ 15,582 | 1.000 | 15,582 | (5,468) | 10,114 | 1.0000 | 10,114 |
| 2013 | $ 16,057 | 0.175 | 2,810 | (986) | 1,824 | 1.0000 | 1,824 |
| | | 1.975 | $ 30,489 | $ (10,699) | $ 19,790 | | $ 19,790 |

To determine future earnings, we applied a growth factor of 3.05 percent to 2013 earnings of $16,057 and adjusted future earnings to Present Value based on a discount factor of 3.00 percent as previously discussed. The Present Value of future earnings under Premise II is $376,807.

---

[7] http://www.fmsbonds.com.

BCG

ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.
Date of Incident: March 13, 2011

**Fringe Benefits**

Fringe benefits in wrongful death litigation generally consist of medical benefits and retirement benefits. Each of these components is discussed below.

Medical Benefits

Medical benefits allowable in wrongful death actions pertain to the loss of medical benefits to surviving spouses or other family members who, as a result of the decedent's death, will incur additional expenses to replace these benefits.

Based on his mother's deposition testimony, Mr. Winans was not a participant in an employer-funded health plan that afforded coverage to his children. Given Mr. Winans' limited education, employment history, and the general state of the economy, it is unlikely that future employment at minimum wage would have afforded his children health coverage fully funded by his employer. We have, therefore, included no loss of medical benefits in our economic damages.

Retirement Benefits

Retirement benefits allowable in wrongful death litigation pertain to the diminution in distributions upon retirement that result from the discontinuation of an employer's funding of retirement benefits on behalf of the decedent. Absent employer records, we established retirement benefits by referencing data compiled by the US Department of Labor, Bureau of Labor Statistics as of June 2012. Based on this source, employers in the private sector of the economy spend an average of 5.00 percent of wages to fund savings, defined contribution, and

- 8 -

Case 2:11-cv-05138-JS   Document 29-3   Filed 12/23/13   Page 11 of 15

BCG

ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.
Date of Incident:  March 13, 2011

defined benefit retirement plans.[8]  We have applied this percentage to wages resulting in retirement benefits under Premise I and II of $11,862 and $19,830, respectively.

**Personal Maintenance**

The determination of economic damages requires that earnings losses be offset by personal maintenance defined as the cost of basic sustenance to allow the individual the opportunity to earn wages.  To establish personal maintenance, we referenced the publication Consumer Expenditure Survey, 2009-2010.[9]  This study indicates that individuals earning $17,966 or less must expend 100 percent of their earnings on fundamental sustenance that includes food, shelter, clothing, transportation, and medical care.  Under Premise I or Premise II, annual wages do not exceed $17,966; thus, no residual earnings would have been generated to be contributed to the support of Mr. Winans' surviving dependents.

**Household Services**

The evaluation of lost household services compares the value of household services that would have been provided to a household but for an incident that require replacement.  Procedures to value the loss of household services include obtaining evidential support of expenditures made to replace those services that would have been performed absent the incident.

At the time of the incident, Mr. Winans was residing with his father.  His two minor children resided with their mother, Levonne Beckham.  No records or testimony have been presented indicating that Mr. Winans provided services to Ms. Beckham's household that benefited his children.  Further, Ms. Beckham has testified that no money was provided to her for the upkeep

---

[8] "Relative Importance of Employer Costs for Employee Compensation, June 2012", US Department of Labor, Bureau of Labor Statistics.
[9] Consumer Expenditure Survey, 2009-2010, U.S. Department of Labor, Bureau of Labor Statistics.

BCG

ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.
Date of Incident: March 13, 2011

of the children or their living environment. Although Ms. Beckham reported that Mr. Winans watched his children when she worked, no documents or testimony have been provided supporting additional monies expended by Ms. Beckham since Mr. Winans' death to replace these services.

Based on the above discussion, we have included no value for the loss of household services to Mr. Winans' children since this amount cannot be established within a reasonable degree of economic certainty.

**ASSUMPTIONS AND LIMITATIONS**

In addition to the assumptions and limitations discussed in this report, the following must be noted:

1. Our economic damages do not include a value for pain and suffering, funeral costs, or the cost of medical treatment incurred by the decedent.

2. Our economic damages do not include pecuniary damages to surviving children consisting of parental guidance and companionship. It is our understanding that these components are not includable under Pennsylvania law. Should these elements be permitted, the value of economic damages presented in this report would increase and our report would require revision, accordingly.

- 10 -



**ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.**
**Date of Incident: March 13, 2011**

SUMMARY AND CONCLUSIONS

Based on the procedures enumerated in this report, subject to the limitations and assumptions contained herein, we have formed the following conclusions within a reasonable degree of economic certainty:

- If Premise I is accepted, economic damages amount to $11,862 as illustrated by the chart below:

|  | Past | Future | Total |
|---|---:|---:|---:|
| Earnings | $ 11,838 | $ 225,399 | $ 237,237 |
| Retirement benefits | 592 | 11,270 | 11,862 |
| Total earnings and benefits | 12,430 | 236,669 | 249,099 |
| Less, personal maintenance | (11,838) | (225,399) | (237,237) |
| **Total economic damages** | $ 592 | $ 11,270 | $ 11,862 |

- If Premise II is accepted economic damages amount to $19,830 as illustrated by the chart below:

|  | Past | Future | Total |
|---|---:|---:|---:|
| Earnings | $ 19,790 | $ 376,807 | $ 396,597 |
| Retirement benefits | 990 | 18,840 | 19,830 |
| Total earnings and benefits | 20,780 | 395,647 | 416,427 |
| Less, personal maintenance | (19,790) | (376,807) | (396,597) |
| **Total economic damages** | $ 990 | $ 18,840 | $ 19,830 |

BCG

**ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.**
**Documents Examined and Research References**

Appendix A

**Case Documents**

- Complaint, dated August 11, 2011.

- Responses to Defendants' First Set of Interrogatories and Request for Production Directed to Plaintiff.

- Deposition of Carmelo Santiago, dated December 14, 2012.

- Deposition of Bernadette Winans, dated February 13, 2013.

- Deposition of Levonne Beckham, dated January 17, 2013.

- Wage and Tax Statement (W-2) for 2011 for Carmelo Winans.

**References:**

- "United States Life Tables, 2007", National Vital Statistics Reports, Vol. 61, Number 3, September 24, 2012.

- "Worklife Estimates: Effects of Race and Education", February 1986, published by the U.S. Department of Labor, Bureau of Labor Statistics (BLS).

- "A Markov Process Model of Work-Life Expectancies by Educational Attainment Based on Labor Force Activity in 1997-8", Journal of Legal Economics, Vol. 10, Number 3, Winter 2000-01.

- "The Markov (Increment-Decrement) Model of Labor Force Activity: New Results Beyond Work-Life Expectancies", Journal of Legal Economics, Vol. 11, Number 1, Summer/Spring 2001.

- "The Markov Process Model of Work-Life Expectancies Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals", Journal of Legal Economics, Vol. 11, Number 1, Summer/Spring 2001.

- "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors", Journal of Forensic Economics, Vol. 22, Issue 2, August 2011.

BCG

**ESTATE of CARMELO WINANS v. CITY OF PHILADELPHIA, et al.**
**Documents Examined and Research References**

Appendix A

- "Table B-47. Hours and earning in private nonagricultural industries, 1965-2011", <u>Economic Report of the President, February 2012</u>.

- <u>Consumer Expenditure Survey, 2009-2010</u>, U.S. Department of Labor, Bureau of Labor Statistics.

- <u>http://www.fmsbonds.com</u>.

- "Relative Importance of Employer Costs for Employee Compensation, June 2012", US Department of Labor, Bureau of Labor Statistics.

- Appendix A -